## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **REPUBLIC UNDERWRITERS** | ) | |
| **INSURANCE COMPANY and** | ) | |
| **SOUTHERN INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.   09-CV-741-PJC** |
| | ) | |
| **KENNETH and LINDA MOORE,** | ) | |
| **individually and d/b/a COUNTRY** | ) | |
| **COTTAGE; et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION AND ORDER

Before the Court are the cross motions for summary judgment: Plaintiffs Republic Underwriters Insurance Company's and Southern Insurance Company's Motion for Summary Judgment regarding Contract Interpretation and its Supplement (Dkt. ## 83 and 134) and Defendants' Motion for Partial Summary Judgment (Dkt. #91). The parties consented to bring these proceedings before the undersigned for resolution. (Dkt. ## 119 and 128).

### PROCEDURAL HISTORY

Plaintiffs Republic Underwriters Insurance Company ("Republic") and Southern Insurance Company ("Southern") (collectively referred to as "Insurers") brought this interpleader action against its insureds Kenneth and Linda Moore d/b/a Country Cottage ( "Country Cottage") and defendants who have asserted claims against the insureds[1] seeking a

---

[1] The named defendants in the Second Amended Interpleader Complaint and Request for Declaratory Relief (hereafter, the "Second Amended Complaint") include Cynthia Ingle, Donna Crafton, Jim Crafton, Cindy Call, Jake Beaver, Sheila Beaver, Jack Bennett, Mary Catherine Bennett, Kenneth Birkes, Connie Birkes, Stacy Mitchell, Royal Dunn, Eric Gibson, Kendra Gibson, Anita Hayes, Robert Hansen, Christine Hansen, Justin Johnson, Belinda Johnson, Matthew Mitchell, Stacy Mitchell, Gerry Morton, Rebecca Morton, David Waddle, Caitlin M. Simpson, Katherine Elizabeth Reid, Christi Sanders, Ellis Buxton, Linda Casey-Buxton, Helen Lankford, Lu Etta Minton, Kenneth Moore, Linda Moore,

declaration that the policies' "per occurrence" limits apply to the total loss and to interplead a total of $3 million to cover that loss ($1 million under Republic's commercial general liability policy number (the "Republic policy") and $2 million under Southern's commercial umbrella insurance policy (the "Southern policy"). *Second Amended Complaint* ¶61 (Dkt. #138).[2]  Should the Court, however, determine there is more than one occurrence, the Insurers seek a declaration that the Republic policy's $2 million products-completed operations aggregate limit applies and not the policy's general aggregate limit, and, therefore, a total of $4 million is available under the Republic and Southern policies.  *Id.* at ¶62.  The subject claims against the insureds arise from an outbreak of *E. coli* O111 infections (hereafter, the "*E. coli* claims") which occurred in August and September of 2008 and resulted in one death and 341 illnesses of persons who ate contaminated food originating from the Country Cottage.

Pursuant to their Motion for Summary Judgment regarding Contract Interpretation and its Supplement (Dkt. ## 83 and 134), the Insurers now move for summary judgment for the following declaratory relief: (1) the *E. coli* claims resulted from one, uninterrupted and continuing "occurrence" as defined by the Republic and Southern policies and accordingly, the

---

Kevin Culver, on behalf of K.C., K.C., and K.C., Raymond Greninger on behalf of D.G., Jonathan Ybarra, on behalf of M.Y. and K.C., and minor children A.H., B.B., D.H., E.C., E.M., H.H., J.M., K.G., S.J, and J. Doe, Minors #7-99.  (Named Defendants Tom and Becky Prag, as parents and next friends of C.P., have been added but have not yet made entries of appearance.)

[2] Plaintiffs have amended their complaint twice since filing this action.  (Dkt. ## 22 and 138).  Although the Second Amended Complaint was filed after the pending summary judgment motions, at the September 10, 2010, the parties agreed to the amendment and to the application of the pending summary judgment motions to the claims as amended in the Second Amended Complaint, which was ultimately filed on September 27, 2010.  All named defendants have filed answers to the Second Amended Complaint except for Linda Casey-Buxton, Helen Lankford, Lu Etta Minton, Kevin Culver, on behalf of K.C., K.C., and K.C., Raymond Greninger on behalf of D.G., Jonathan Ybarra, on behalf of M.Y. and K.C. (As a result of the amendment, Defendants David and Letha Langren, Jane Doe, J.D., C.P. and Defendants 8-36 were terminated on September 30, 2010.)

limits of liability total $3 million; or, (2) should the Court determine there to be more than one occurrence, the $2 million products-completed operations aggregate limit ("PCOAL") and not the general aggregate limit ("GAL") in the Republic policy applies; therefore, a total of $4 million is available under the Republic and Southern policies.

Defendants, Cynthia Ingle, as administrator of the estate of Clifton Chad Ingle, deceased, Caitlin M. Simpson, Cindy Call, Jim & Donna Crafton, Christi Sanders, Katherine Elizabeth Reid, Ellis Buxton, Linda Casey-Buxton, Lu Etta Minton and minors K.C., K.C., K.C., D.G. and M.Y. (hereafter "Defendants")[3] move for partial summary judgment that (1) the *E. coli* claims result from multiple "occurrences" as defined under the subject policies; (2) Republic policy's general aggregate limit ("GAL") of $2 million applies to claims based on "bodily injury" from consumption of allegedly contaminated food at a church tea catered by Country Cottage; (3) Republic policy's $2 million products-completed operation aggregate limit ("PCOAL") separately applies to claims for "bodily injury" from consumption of allegedly contaminated food on the Country Cottage premises; and (4) the Southern policy's $2 million aggregate limit of liability applies to all injuries caused by the alleged contamination both on and off premises. Thus, the Insurers' maximum amount of liability insurance for the *E. coli* claims is $6 million ($4 million by Republic and $2 million by Southern).

---

[3] On September 2, 2010, Defendants Lu Etta Minton and minors K.C., K.C., K.C., D.G. and M.Y. joined in the partial summary judgment originally filed on behalf of Defendants, Cynthia Ingle, as administrator of the estate of Clifton Chad Ingle, deceased, Caitlin M. Simpson, Cindy Call, Jim & Donna Crafton, Christi Sanders, Katherine Elizabeth Reid, Ellis Buxton, Linda Casey-Buxton.  (Dkt. # 129).

## STATEMENT OF UNDISPUTED FACTS

1.    Republic issued a commercial general liability insurance ("CGL") policy (Number CMP 5640996 05) (the "Republic policy") to defendants John and Linda Moore d/b/a Country Cottage for the policy period November 17, 2007 to November 17, 2008.   Southern also insured Country Cottage under a commercial umbrella insurance policy (Number UMB 5631431 05) (the "Southern policy") for the same policy period.

2.    The Republic policy provides in relevant part the following:

> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
> 1. Insuring Agreement
>     a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>         (1)    The amount we will pay for damages is limited as described in Section III- Limits Of Insurance; and
>             * * *
>     No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.
>     b.    This insurance applies to "bodily injury" and "property damage" only if:
>         (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory'';
>         (2)    The "bodily injury'' or "property damage" occurs during the policy period; . . .
>             * * *
> SECTION III - LIMITS OF INSURANCE
> 1.    The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of :
>     a. Insureds;
>     b. Claims made or "suits" brought; or
>     c. Persons or organizations making claims or bringing "suits".
> 2.    The General Aggregate Limit ["GAL"]is the most we will pay for the sum of:
>     a. Medical expenses under Coverage C
>     b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; . . .

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit ["PCOAL"] is the most we will pay under Coverage A for damages because of "bodily injury" and "property damages" included in the "products-completed operations hazard".

\* \* \*

5. Subject to 2 . . . above. . . . the Each Occurrence Limit is the most we will pay for the sum of:

  a.  Damages under Coverage A; and

  b.  medical expenses under Coverage C because of all "bodily injury" and "property damage" arising out of any one "occurrence."

3. As noted above, the Republic policy excepts from GAL damages bodily injury damages included in the "products-completed operations hazards" which is defined, as amended by the Endorsement, as follows:

"Products-completed operations hazard":

  a. Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or property damage" occurs after you have relinquished possession of those products. [4]

---

[4] Before the Endorsement's replacement, Paragraph a. defined "Products-completed operations hazard" as follows:

  a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:

    (a) When all of the work called for in your contract has been completed.

    (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

5

4.      The Endorsement states:

PRODUCTS/COMPLETED OPERATIONS HAZARD REDEFINED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
SCHEDULE

Description of Premises and Operations:

RESTAURANTS

With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

1. On, from or in connection with the use of any premises described in the Schedule, or

2. In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf,

Paragraph a. of the definition of "Products -completed operations hazard" in the DEFINITIONS Section is replaced by the following:

"Products-completed operations hazard":

a.      Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or property damage" occurs after you have relinquished possession of those products.

5.      The pertinent provisions of the Southern policy include the following:

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.      Insuring Agreement

a.      We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. . . . At our discretion, we may investigate any "occurrence" that may involved this insurance and settle any resultant claim or "suit", for which we have the duty to defend.

But:

(1)      The amount we will pay for the "ultimate net loss" is limited as described in Section III- Limits of Insurance;

* * *

No other obligation or liability to pay sums or perform acts or service is covered unless explicitly provided for under Supplementary Payments - Coverage A and B.

6

SECTION III - LIMITS OF INSURANCE

1.       The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of :

        a. Insureds;

        b. Claims made, "suits" brought, or number of vehicles involved; or

        c. Persons or organizations making claims or bringing "suits".

2.       The Aggregate Limit is the most we will pay for the sum of all "ultimate net loss" under:

        a. Coverage A, except "ultimate net loss" because of "bodily injury" or "property damage" arising out of the ownership, maintenance or use of a "covered auto"; and

        b. Coverage B.

3.       Subject to 2. above, the Each Occurrence Limit is the most we will pay for the sum of all "ultimate net loss" under Coverage A because of  all "bodily injury" and "property damage" arising out of any one "occurrence".

6.       The Republic policy has an " each occurrence" limit of liability of $1 million, a GAL of $2 million and PCOAL of $2 million.  The Southern policy has an aggregate limit of liability of $ 2million.

7.       "Occurrence" is defined under both policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

8.       The parties rely on and do not dispute the findings of the Oklahoma State Department of Health ("OSDH") in its Final Report on the Epidemiological Investigation of Restaurant-Associated *Escherichia coli* O111:NM Outbreak – Mayes County, Oklahoma, 2008 (the "OSDH Report") as factual support for their interpretations of the amounts of liability under the policies, specifically, the following:

      a.       The *E.coli* O111:NM Outbreak (the "*E.coli* outbreak"), the largest such outbreak in the United States at the time of the OSDH Report, was "a point source outbreak originating from the Country Cottage restaurant." *Id*. at 1.

b.     "A total of 341 persons met the outbreak case definition, including 60 confirmed, 94 probable and 187 suspect cases. Of the 341 cases, 21 attended the catered Ladies Tea [on August 16, 2008 at the Free Will Baptist Church in Broken Arrow (hereafter, the "Church Tea")] and did not dine at the Country Cottage restaurant. There were no persons classified as a primary outbreak case who attended both the catered event and ate at the restaurant." *Id*. at 11 (citations omitted).

c.     "Some food items served at the Church Tea were prepared at the Country Cottage restaurant on the day before the event, while other foods and ingredients were transported to the church for onsite preparation and service. Five restaurant employees were identified as principal foodhandlers for the event. . . . In their summary report, CDC investigators stated that it remains unclear how crosscontamination of foods occurred at the catered event, but surmised that contamination of food items, especially melons was likely caused by foodhandlers who sliced and prepared the fruits for the catered event and were also present for the event. Three foodhandlers were reported to have sliced watermelon and assembled fruit trays." *Id*. at 19.

d.     The OSDH concluded, "In the absence of isolating the outbreak organism from any environmental specimen, including restaurant surfaces, food, well water and animal feces, or from a restaurant employee who reported diarrheal illness, the original vehicle of contamination could not be determined. The exact mode of spread within the restaurant was not established, however, the epidemic curve and exposure analyses suggests there was ongoing foodborne transmission of E. coli

8

O111:NM to Country Cottage restaurant patrons between August 15 and August 24, 2008." *Id*. at 21.

## SUMMARY JUDGMENT STANDARD

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate where the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Windon Third Oil & Gas v. FDIC*, 805 F.2d 342 (10th Cir. 1986). In *Celotex*, the court stated:

> The plain language of Rule 56(c) m andates the entry of s ummary judgment, after adequate time for discovery and upon motion, against a party who fails to m ake a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 323.

To survive a motion for summary judgment, the respondent must establish that there is a genuine issue of material fact for trial. The disputed fact must be material to the claim and the dispute must be genuine. Respondent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Zenith*, 475 U.S. 574, 585 (1986). Evidence presented by the respondent is deemed to be true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346. The respondent "need only present evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). When the court decided a motion for summary judgment based on the lack of proof of a material fact, the judge must ask whether a "fair-minded" jury could return a verdict for the

9

plaintiff on the evidence presented.  *Windon*, 805 F.2d at 346 (citing *Anderson*).    The moving party must show that there is no genuine issue of material fact and that, therefore, he is entitled to judgment as a mater of law.  Movant must show entitlement to summary judgment beyond a reasonable doubt.  *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir. 1978).

The Tenth Circuit Court of Appeals has stated that summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Factual disputes about immaterial matters are irrelevant to a summary judgment determination.  "We view the evidence in a light most favorable to the nonmovant; however, it is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative."  *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992).

A movant need not provide evidence negating an opponent's claim; rather, the burden is on the nonmovant, who "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* (quoting *Anderson* 477 U.S. at 257).  After the nonmovant has had a full opportunity to conduct discovery, this burden falls on the nonmovant even though the evidence probably is in possession of the movant. *Id.* (Citations omitted.).

## ANALYSIS

The first determination for the Court is whether the *E.coli* claims arise from one or more "occurrence," as that term is defined under the subject policies.  The interpretation of a provision of an insurance policy, if not ambiguous, is a question of law.  *Haworth v. Jantzen*, 172 P.3d 193, 196 (Okla. 2006).  "An insurance contract is ambiguous only if it is susceptible to two constructions on its face from the standpoint of a reasonably prudent layperson, not from that of

10

a lawyer." *Id*.  "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy." 36 Okla.Stat.tit.36, §3621.

The definition of  "occurrence" in the subject policies is unambiguous.  While the construction of the policy term "occurrence"  in light of the pertinent facts can produce a question of fact for the jury, here the parties do not dispute the factual findings relating to the "occurrence" set forth in the OSDH Report.  Accordingly, this determination is properly before the Court for summary judgment.

If the Court finds only one occurrence, the Court need not address whether the GAL or PCOAL in the Republic policy applies as there is no issue of aggregate claims.  The parties agree that the Insurers are liable for the *E. coli* claims for damages due to "bodily injury' . . . to which this insurance applies," and thus, the maximum amount of insurance available under the "Each Occurrence Limit" clause would be $1 million under the Republic GCL policy and $2 million under the Southern umbrella policy, for a total of $3 million. If, however, the Court determines there is  more than one occurrence, the maximum amount of insurance under the Republic policy is defined under its aggregate limits clauses, the GAL and/or PCOAL.

1.      **The Number of "Occurrences" for which the Insurers are liable.**

As noted above both policies define "occurrence" as  "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Although not all courts have similarly constructed this "occurrence" clause in liability insurance contracts, the majority of courts have held that the number of occurrences as defined above is determined by

looking to the cause or causes of the resulting damage, rather than to the number of individual claims or injuries (the "effect").  *See, e.g.*, *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 753 (Ill. 2009); *Heggem v. Capitol Indem. Corp.*, 154 P.3d 1189, 1195 (Mont. 2007).   There is no Oklahoma law on the issue but the Tenth Circuit Court of Appeals has predicted that Oklahoma courts would follow this prevailing view.  *See Business Interiors, Inc. v. Aetna Casualty and Surety Company*, 751 F.2d 361, 363 (10th Cir. 1984) ("The rule which we choose to apply is the general one that 'an occurrence is determined by the cause or causes of the resulting injury.'"); *Farmers Alliance Mutual Ins. Co. v. Salazar*, 77 F.3d 1291, 1296 (10th Cir.1996).   Applying this cause theory, however, does not necessarily render uniform results,[5] as is apparent in the following cases addressing the number of "occurrences" arising from an insured restaurant's serving contaminated food.

In *Mason v. Home Ins. Co. of Illinois*, 532 N.E.2d 526 (Ill.App.Ct. 1988),[6] the appellate court reversed the trial court's ruling that plaintiffs' claims of botulism poisoning from

---

[5] The "malleability of occurrence-counting" has been criticized by both commentators and courts. *See, e.g.*, Jeffrey W. Stempel, *The Insurance Policy as Social Instrument and Social Institution*, 51 Wm. & Mary L. Rev. 1489, 1514 (March 2010) (advocating a "consistently injury-centered standard for assessing occurrences" as being in line with the "insurance-policy-as-social-instrument concept"); Allan D. Windt, *Number of occurrences - In General, 3* Insurance Claims and Disputes 5th §11:24 (March 2010); *Plastics Engineering Co. v. Liberty Mutual Ins. Co.*, 759 N.W.2d 613, 620 (Wis. 2009) (noting the various approaches courts have taken in determining what constitutes an occurrence in asbestos-related claims and the varying results); *London Market Insurers v. Superior Court*, 53 Cal.Rptr.3d 154, 161 (Cal.Ct.Ap..2007) (same).

[6] The definition of "occurrence" in the policy at issue in *Mason* is slightly, though not substantively, different than that in Republic's and Southern's policies:

> "occurrence" means either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Mason*, 532 N.E.2d at 527.

consumption of patty melt sandwiches at a restaurant arose out of a single occurrence, reasoning

that -

> [t]he "occurrence" to which the policy refers is the occurrence or events for which the insured was liable, and here, the insured incurred liability for serving its patrons contaminated food.
> So long as the Skewer Inn retained possession of the tainted food, no liability could result. Serving to a consumer a food item contaminated with the botulism toxin constituted the act from which liability arose. Each instance in which a customer was presented with tainted food over the three day period created additional exposure to liability and constituted a separate occurrence under the policy. No plaintiff was subjected to either a continuous or repeated exposure to conditions causing injury. These circumstances did not present one uninterrupted and continuing cause, but several distinct acts-individual sales to separate patrons over a three day period-each of which resulted in exposure to liability.

*Id.* at 529.

Yet, in *Fireman's Fund Ins. Co. v. Scottsdale Ins. Co.*, 968 F.Supp. 444 (E.D.Ark. 1997), the court determined that a restaurant's "multiple sales of contaminated food at a restaurant to several customers" constituted one occurrence.[7]  The court, however, noted that "if the factual evidence were to reveal that two or more wholly independent events occurred, each resulting in injury (such as food being contaminated by someone in August and someone else contaminating food in October."), then more than one occurrence might be found."  *Id.* at 448.

Here, the Insurers argue that the "cause" of the *E. coli* outbreak and resulting injuries was the preparation, handling or storage of contaminated food by Country Cottage during a discrete time period and thus they are liable only for one occurrence under the policies.  Defendants, contrarily, contend that the deliberate sale and service of food which was contaminated due to the negligence of Country Cottage in failing to either prevent, discover or eliminate the

---

[7] The "occurrence" definition construed by the *Fireman's Fund* court is identical to the one at issue here.

contamination and not serve contaminated food was the immediate cause of each person's injury and thus, each, a separate occurrence.

The parties cite two Tenth Circuit cases applying Oklahoma law in support of their opposing positions.  The Insurers argue that *Business Interiors, Inc. v. Aetna Cas. and Surety Co.*, 751 F.2d 361 (10th Cir. 1984) supports their view of the pertinent causal event.  In predicting Oklahoma law, the Tenth Circuit adopted the general rule that "an occurrence is determined by the cause or causes of the resulting injury" and found that the insured company's claim for losses it incurred through its employee's forgery and material alterations of forty checks resulted from the "continued dishonesty of one employee," and thus, was a "single loss" under the policy.  *Id*. at 363-64.  Defendants rely on *Farmers Alliance Mutual Ins. Co. v. Salazar*, 77 F.3d 1291 (10th Cir. 1996) for support that the causal event determinative of the number of occurrences is not an overarching or remote cause but an immediate cause.

Though neither case is on point, both offer the Court guidance.  As stated above, *Business Interiors* and *Salazar* predict that Oklahoma would adopt the "cause" approach in determining a covered occurrence.  *Business Interiors*, 751 F.2d at 363; *Salazar*, 77 F.3d at 1295-97.  The Court knows of no succeeding Oklahoma case or Tenth Circuit interpretation of Oklahoma law that calls this view into question.

The use of *Business Interiors*, however, effectively ends there as the Tenth Circuit then turned its attention to determining whether there were one or forty independent covered losses under the employee dishonesty clause,[8] concluding the following:

---

[8] The employee dishonesty clause also included the following provision:
As respects any one employee, dishonest or fraudulent acts of such employee during the policy period shall be deemed to be one occurrence for the purpose of applying the deductible.

14

> In this case, the cause of Business Interiors' loss was the continued dishonesty of one employee. The district court recognized this and stated "the probable intent of the employee with regard to the last thirty-nine checks [was] essentially the intent to continue the dishonesty, not to commit an entirely new and different act of dishonesty." As such, the employee's fraudulent acts constituted a single loss for Business Interiors.

*Id*. at 363.  The *Business Interiors* court, therefore, focused on the fraudulent intent of one employee in determining the number of losses resulting from the forty forged or altered checks - circumstances and policy language too far afield from the facts and policies before the Court.

*Salazar* is more helpful.   The Tenth Circuit there addressed what causal event creates an "occurrence" for purposes of determining whether a claim against a homeowner, Ms. Salazar, was covered under her homeowner's insurance policy for negligent supervision of her son Manuel Corrales who gave a gun to Jacob De LaCruz who shot and killed Thomas Byus in a gang confrontation.  Before addressing the policy definition of "occurrence",[9] the Court stated that it must first determine "what event or events in the causal chain" that resulted in Byus' death should be the focus of its inquiry: the immediate cause of Byus' death - De LaCruz's

---

*Id*. at 362.  Although this provision specifically applies to the deductible and not liability, it would make little sense to interpret "occurrence" differently as it relates to liability.

[9]  The policy at issue in *Salazar* defined "occurrence" as
an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

*Id*. at 1297.  This policy language includes most of the same terms at issue here - "an accident, including continuous or repeated exposure to . . . conditions," although the *Salazar* policy also includes in the definition what is clearly excluded - bodily injuries that the insured did not expect or intend.  The Republic and Southern policies state this same exclusion in a separate provision.

"firing of a bullet" into Byus' head, or "further up the causal chain to Ms. Salazar's negligent supervision of Manuel and Manuel's negligent entrustment of the murder weapon to Jacob De LaCruz." *Id*. at 1295.

In considering which causal event the Oklahoma Supreme Court would focus upon in determining an "occurrence," the Tenth Circuit considered "cases that might help by analogy or deduction" and settled on those that answered "when an 'occurrence' happens" and "where." *Id*. The court noted that it was "well-settled. . . that the time of an occurrence of an accident, within the meaning of a liability indemnity policy, is not the time when the wrongful act was committed, but the time when the complaining party was actually damaged," citing among other authorities, *Harbour v. Mid-Continent Cas. Co.*, 752 P.2d 258, 261 n. 3 (Okla.Civ.App. 1987). The Tenth Circuit further determined that the generally accepted rule regarding the location of an "occurrence" is that it is the "place where the injury happened; it does not matter that a precipitating event took place elsewhere." *Salazar*, 77 F.3d at 1296. The court then deduced the following:

> We find that when determining whether a bodily injury was "caused by an occurrence" the question of whether there was an "occurrence" should be resolved by focusing on the injury and its immediately attendant causative circumstances. We reach this conclusion by means of simple deduction. If the time and place of an "occurrence" are determined by the time and place of the injury, then the acts which are said to constitute the "occurrence" must necessarily fall within the same temporal and spatial parameters.

*Id*.

Although the issue here does not involve an intervening intentional tort, *Salazar* is still instructive in determining the number of occurrences. However, in doing so the Court need not reach the question of whether the pertinent causal event of the claimants' injuries is the contamination of the food or the sale/service of the contaminated food for purposes of these

16

summary judgment motions on the amount of the Insurers' liability.  Even if the Court were to adopt the Insurers' more general and remote cause -  the preparation, handling or storage of contaminated food by Country Cottage during the discrete time period of August 15 through August 24, 2008 - as the reference point to determine "occurrence," the Court finds there were two distinct places of injury and thus, two separate occurrences.   Looking for "the same temporal and spatial parameters" of an occurrence, the Court finds that the undisputed facts at least establish two separate occurrences of *E. coli*-induced illness covered under the policies: that resulting from the negligent contamination of food prepared and served at the Country Cottage restaurant and that resulting from the negligent contamination of food prepared and served at the Church Tea.   Regardless of any temporal overlap between these two occurrences,[10] the geographical distinction between the physical location of Country Cottage restaurant in Locust Grove, Oklahoma, and that of the Free Will Baptist Church in Broken Arrow, Oklahoma where the Church Tea took place is appreciable and, appreciatively, concrete.  Further, the undisputed facts are that "no persons classified as a primary outbreak case . . . attended both the catered event and ate at the restaurant" and although some of the foods served at the Church Tea were prepared at the Country Cottage, others were transported to the Free Will Baptist Church "for onsite preparation and service."  Because the Court finds more than one occurrence even under the Insurers' cause theory, the amount of liability under the Republic policy must be determined under an aggregate and not "each occurrence" limit provision.

---

[10]  The OSDH Report fixes the *E. coli* exposure to patrons of Country Cottage to August 15 through August 24, 2008, when the Country Cottage was closed down.  The Church Tea took place on August 16, 2008.

**2.      The Aggregate Limits of Liability under the Republic policy.**

The Insurers argue that the pertinent aggregate limit under the Republic policy is the

Products/Completed Operations Aggregate Limit ("PCOAL") of $2 million and not the General

Aggregate Limit ("GAL") of $2 million.  They contend that the Products/Completed Operations

Hazard (the "PCOH") as modified by the Endorsement (together, the "PHE") broadened the

original provision to include "bodily injury" "that arises out of 'your products' if the 'bodily

injury' . . . occurs after you have relinquished possession of those products," to bodily injuries -

> arising out of 'your products' manufactured, sold, handled or distributed:
> 1. On, from or in connection with the use of any premises described in the
> Schedule, or
> 2. In connection with the conduct of any operation described in the Schedule,
> when conducted by you or on your behalf.

Therefore, all of the *E. coli* claims arising out of the Country Cottage's operations as a restaurant

are encompassed under the PHE, whether the food was served at the Country Cottage or the Free

Will Baptist Church. Accordingly, the GAL is not implicated as it expressly excepts from its

scope, "bodily injury . . . included in the 'products-completed operations hazard" and the only

applicable aggregate limit is the PCOAL, "the most we will pay under Coverage A for damages

because of 'bodily injury' . . . included in the 'products-completed operations hazard'"-  in this

case, $2 million.

In their reply, the Defendants concede that the original PCOH provision has been

modified by the Endorsement and, as modified, they now agree with the Insurers that the

PCOAL applies to the claims of the patrons who ate at the Country Cottage. However, they

argue that the Endorsement (and therefore, the PHE) does not apply to the potential claims

arising from the Church Tea.

Defendants do not dispute that the food sold and served at the Church Tea is within the definition of "your product"[11] and that the "bodily injuries" suffered by attendees of the Church Tea resulted from the sale, handling or distribution (although not the "manufacture") of contaminated food at the church.  However, they argue that neither paragraph 1 or 2 of Endorsement triggers its application to the injuries arising from the Church Tea.

Defendants contend that paragraph 1 does not trigger application of the Endorsement because  the Free Will Baptist Church is not a "premises described in the Schedule" of the Endorsement or the Declarations.  There is no description of the premises in the Endorsement and the Declarations identifies the premises simply as "ALL PREMISES YOU OWN, RENT OR OCCUPY, under which the address of 6570 Highway 82 South, Locust Grove, Oklahoma 74352 is identified."  Therefore, the Endorsement applies only if bodily injuries arose out of the sale, handling or distribution of food by Country Cottage  "[o]n, from or in connection with the use of" the Country Cottage location.  The contaminated food was not sold, handled or distributed "on" the Country Cottage location.  Neither was it sold, handled or distributed "from" the Country Cottage; it was sold, handled or distributed "from" the Free Will Baptist Church. Finally, it was not sold, handled or distributed  "in connection with the use of" Country

---

[11]  The following is the definition under the Republic policy:
21."Your product":
a. Means:
     (1) Any goods or products, other than real
     property, manufactured, sold, handled, distributed
     or disposed of by:
          (a) You;
          (b) Others trading under your name; or
          (c) A person or organization whose business
          or assets you have acquired; and
     (2) Containers (other than vehicles), materials,
     parts or equipment furnished in with such goods or products.

Cottage's premises as this phrase in an insurance policy has been defined as follows:

> In common parlance, "use" means "continued or repeated exercise or employment," or "habitual or customary practice." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2523, (4th ed.1976). "Connection" means "the act of connecting: a coming into or being put in contact," id. at 481, and "with" is defined as "alongside of: near to." Id. at 2626.

*Allstate Ins. Co. v. Drumheller*, 185 Fed.Appx. 152, 156 (3d Cir. 2006)(*quoting State Farm Fire and Cas. Co. v. MacDonald,* 850 A.2d 707, 711 (Pa.Super.Ct.2004)).  As the contaminated food was sold, handled and distributed at the church, there was no continued, repeated or customary activity having physical contact with the Country Cottage restaurant.

Defendants contend that paragraph 2 of the Endorsement also does not apply because the food was not sold, handled or distributed by Country Cottage "[i]n connection with the conduct of any operation described in the Schedule which is conducted by" Country Cottage.  "In connection with," as noted above, refers to a close physical relationship and that close physical relationship must be between the sale, handling or distribution of the contaminated food and Country Cottage's conduct of any "operation described in the Schedule."  "Operation" is ordinarily understood as "the process or manner of conducting." *Medina v. State*, 871 P.2d 1379, 1382 (Okla. 1993) (interpreting "operation" in the Oklahoma statute pertaining to the immunity of prison personnel according to its ordinary meaning); *see also, Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City of St. Louis,* 947 S.W.2d 505, 507 (Mo.Ct.App. 1997)(In interpreting additional insureds coverage of airports where the insured is performing their "operations," the Court looked to the plain meaning of "operations": "Webster's New Collegiate Dictionary (1977) defines 'operation' as '[the] performance of a practical work or of something involving the practical application of principles or processes." ).  Defendants contend that the relevant

20

"operation" is the preparation and serving of food at the church and that the sale, handling and distribution of the food at the church was "in connection with" this "operation." However, the relevant "operation" is not the one described in the Schedule of the PHE as simply "RESTAURANTS," because the ordinary definition of "restaurant" contemplates services on the premises of the establishment. *See, e.g., Food Corp. v. Zoning Bd. of Adjustment of City of Philadelphia* 384 Pa. 288, 290-291, 121 A.2d 94, 95 (Pa.1956) (In determining whether an establishment's parking lot is a "restaurant" within a zoning ordinance, the court reasoned that "[a] restaurant is defined in Webster's International Dictionary as 'An establishment where refreshments or meals may be procured by the public; a public eating house,' and while this no doubt assumes that the refreshments are to be eaten on the premises, that qualification is here complied with since the food will be consumed there even though it be in automobiles stationed thereon."); *Colony Nat'l Ins. Co. v. Hing Wah Chinese Restaurant*, 546 F.Supp.2d 202, 206-08 (E.D.Pa. 2008) (finding that the restaurant's CGL policy did not cover injuries caused by the negligent driving of an employee who was delivering an order to a customer off the premises at the time of the accident because the ordinary meaning of "restaurant" covered in the policy Declarations assumes that the food is to be eaten on the premises).

Defendants conclude that because neither paragraphs 1 or 2 trigger the application of the Endorsement, the claims of persons who became ill at the Church Tea fall under the GAL and not the PCOAL. Therefore, there is a total of $4 million in coverage under the Republic policy - $2 million under the PCOAL for claims arising from consumption of contaminated food at the Country Cottage restaurant and $2 million under the GAL for claims arising from the consumption of contaminated food at the Free Will Baptist Church.

21

In their sur-reply, the Insurers object to Defendants' "tortured reading" of the Endorsement which, if correct, would make Country Cottage not liable for catering the Church Tea.  They distinguish *Hing Wah Chinese Restaurant* as the CGL policy at issue there did not include the broader language of the Endorsement.  Given the ordinary meaning of "connection" as "a causal or logical relation or sequence . . . relationship in fact," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 481 (2002), the Insurers assert that there is no question that catering food off-premises is "in connection with" the conduct of Country Cottage's business as a restaurant.

The Court agrees. Interpreting the ordinary meaning of the terms in paragraph 2 of the Endorsement, the Court finds that the *E. coli* illnesses resulting from the Church Tea are "bodily injur[ies] . . . arising out of '[Country Cottage's] products' . . . sold, handled or distributed . . . [i]n connection with the conduct of [operating a Restaurant] . . ., when conducted by [Country Cottage] or on [its] behalf."  Accordingly, the Court concludes that all the injuries are covered under the PCOH, as amended by the PHE, and the total aggregate liability under the Republic policy is $2 million under the PCOAL.

In sum, the Court finds that the $2 million Products-Completed Operations Aggregate Limit of liability in the Republic policy and the $2 million aggregate limit of liability in the Southern policy apply to the total loss sustained by Country Cottage.  Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs Republic Underwriters Insurance Company's and Southern Insurance Company's Motion for Summary Judgment regarding Contract Interpretation and its Supplement (Dkt. ## 83 and 134) and Defendants' Motion for Partial Summary Judgment (Dkt. #91).

IT IS SO ORDERED, this 28th day of October, 2010.

Paul J. Cleary
United States Magistrate Judge